*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHELBY ROSE SOWLE,

Plaintiff-Appellee,

and

HANGER PROSTHETICS AND ORTHOTICS,
INC., doing business as HANGER CLINIC,

Intervening Plaintiff-Appellee,

v

ESURANCE INSURANCE COMPANY,

Defendant-Appellant.

UNPUBLISHED
July 23, 2020

Nos. 346289; 347819; 348538
Ingham Circuit Court
LC No. 17-000035-NF

Before: CAMERON, P.J., and SHAPIRO and LETICA, JJ.

PER CURIAM.

In Docket No. 346289, defendant Esurance Insurance Company (Esurance) appeals as of right a judgment in favor of plaintiff, Shelby Rose Sowle, and intervening plaintiff, Hanger Prosthetics and Orthotics, Inc. (collectively, Sowle plaintiffs), after the trial court granted summary disposition under MCR 2.116(C)(10) (no genuine issues of material fact). In Docket Nos. 347819 and 348538, Esurance appeals as of right the trial court's orders granting overdue no-fault benefit interest and attorney fees to Sowle plaintiffs. We affirm.

## I. BACKGROUND

March 2016, only days after Sowle and her mother, Melissa Rees, purchased a 2000 Saturn for Sowle's use, the Saturn impacted a tree while Sowle was traveling at high speed. After Rees and Sowle purchased the Saturn, Rees had added the Saturn to an Esurance insurance policy that also provided insurance for Rees's 2001 Dodge RAM. Sowle did not live with Rees. Immediately before the accident, Sowle and her boyfriend, Michael Wolff, had a domestic dispute at the motel where Sowle lived. During the dispute, Sowle had repeatedly followed Wolff and refused to let

-1-

him leave. Sowle eventually told Wolff that he could leave in his truck. Wolff accelerated rapidly out of the motel parking lot because he believed the police were on the way. After continuing to accelerate to the corner, Wolff put on his blinker to turn left. He saw Sowle's Saturn in his passenger mirror going around his vehicle to the right, where there was only a bike lane, gravel, and grass, at high speed. Sowle's Saturn left the road and impacted a tree about 20 yards off the roadway. As a result, Sowle, who was not wearing her seat belt, suffered catastrophic injuries. Esurance ultimately denied insurance coverage for Sowle's accident.

## II. MAINTENANCE OF INSURANCE

Esurance argues that the trial court erred by determining that Rees maintained coverage on the Saturn for the purposes of the no-fault act because Rees was not a "named insured" of the policy. We reject Esurance's argument.

We review de novo a lower court's decision on a motion for summary disposition. *Dye v Esurance Prop & Cas Ins Co*, 504 Mich 167, 179; 934 NW2d 674 (2019). A party is entitled to summary disposition if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." MCR 2.116(C)(10). A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 116; 839 NW2d 223 (2013).

The no-fault act requires an insurer to pay personal injury protection (PIP) benefits "for accidental bodily injury arising out of the ownership, operation, or maintenance of a motor vehicle as a motor vehicle . . . ." MCL 500.3105(1). "The owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance . . . ." MCL 500.3101(1). In *Dye*, 504 Mich at 188, our Supreme Court held that "determining whether no-fault benefits are available to an injured person does not depend on 'who' purchased, obtained, or otherwise procured no-fault insurance." *Id*. at 181. No-fault benefits are not precluded when someone other than the vehicle's owner or registrant purchased no-fault insurance for the vehicle. *Id*. at 192-193.

In this case, Rees was a co-owner of the Saturn, which was covered under the Esurance policy that she shared with her then-boyfriend, Joel Herington. Rees and Herington's policy was paid for with Rees's credit card. Because Rees maintained insurance on the Saturn, Esurance's argument that Sowle is not entitled to no-fault benefits because she was not a named insured lacks merit.

## III. PRIORITY

Esurance recognizes *Dye*'s impact, but argues that *Dye* did not address an insurer's obligation to pay PIP benefits under MCL 500.3114(4). Esurance contends that the plain language of its policy did not cover Sowle or Rees because the Saturn was not owned by the named insured, Herington.

Plaintiffs contend that Esurance abandoned its priority claim below, even expressly informing the trial court that priority was a non-issue. We agree. *Polkton Charter Twp v*

*Pellegrom*, 265 Mich App 88, 95-96; 693 NW2d 170 (2005). Even so, because Esurance raised this question below, albeit for a different purpose, and the trial court rejected it, we will address it.

The relevant priority provision[1] reads:

> (1) Except as provided in subsections (2), (3), and (5), a personal protection insurance policy described in section 3101(1) applies to accidental bodily injury to the person named in the policy, the person's spouse, and a relative of either domiciled in the same household, if the injury arises from a motor vehicle accident.

> \* \* \*

> (4) Except as provided in subsections (1) to (3), a person suffering accidental bodily injury arising from a motor vehicle accident while an occupant of a motor vehicle shall claim personal protection insurance benefits from insurers in the following order of priority:

> (a) The insurer of the owner or registrant of the vehicle occupied.

> (b) The insurer of the operator of the vehicle occupied. [MCL 500.3114.]

"MCL 500.3114(4) applies when the injured person is not covered by his or her own insurance or the insurance of a relative domiciled in the same household under MCL 500.3114(1) and permits the injured person to seek benefits from the no-fault insurers of others, including the vehicle's owner, registrant, or operator." *Stone v Auto-Owners Ins Co*, 307 Mich App 169, 176; 858 NW2d 765 (2014). We have held that "even if the owner, registrant, or operator of a vehicle is not a named insured under a policy, the named insured's insurer may also constitute an 'insurer' of the owner, registrant, or operator under MCL 500.3114(4) if the policy expands the definition of 'insured person' beyond the named insured so that it includes those persons." *Id*. at 176-177. And we have previously defined "insurer" as "one who agrees, by contract, to assume the risk of another's loss and to compensate for that loss." *Id*. at 177 (quotation marks omitted).

When interpreting an insurance contract, this Court construes contractual terms in context, according to their commonly used meanings. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). A court will not hold an insurance company liable for a risk it did not assume. *Id*. "The policy application, declarations page of policy, and the policy itself construed together constitute the contract." *Royal Prop Group, LLC v Prime Ins Syndicate, Inc*, 267 Mich App 708, 715; 706 NW2d 426 (2005). The Court must interpret a contract in a way that gives every word, phrase, and clause meaning, and must avoid interpretations that render parts of the contract surplusage. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d

---

[1] The no-fault act was significantly amended, effective June 11, 2019. See 2019 PA 21. The statutory language at issue here is now appears in MCL 500.3114(1) and (5), but our references will be to the statutory provisions then in effect.

447 (2003). That a word is not defined does not render a contract ambiguous. *Henderson*, 460 Mich at 354.

Esurance's policy provides coverage for the named insured and for "[a]ny other person who sustains *'bodily injury'*: . . . [w]hile *'occupying'* a *'covered auto' 'owned'* by the named insured . . . ." Esurance argues that Sowle was not a person who sustained bodily injury that would be covered because Herington, who was the policy's named insured, did not own the Saturn. Esurance further contends that the trial court erred by holding that the term "additional driver" that applied to Rees was synonymous with "named insured." We disagree.

In *Stone*, the spouse of a child who did not live in the insureds' household attempted to claim survivor's loss benefits from her parents' policy, which provided that survivor's loss benefits would be paid to the named insured. *Stone*, 307 Mich App at 172. When determining whether the child's spouse was entitled to survivor's loss benefits from her parents' policy, we held that "the person named in the policy" under MCL 500.3114(1) and the "named insured" are synonymous, and persons designated as drivers are not named insureds. *Id*. at 175. However, we also noted that the plaintiff had not argued that there was a latent ambiguity in the policy when the plaintiff's policy provided a different coverage than the manner in which the insured's agent informed the plaintiff that she was covered. *Id*. at 179-180.

A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the " 'necessity for interpretation or a choice among two or more possible meanings.' " *Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010). A latent ambiguity arises when the contract's terms appear clear until they are applied. *Id*. This requires the trial court to consider extrinsic evidence to determine whether the contract language is susceptible to more than one interpretation, and then to consider the extrinsic evidence to determine the contract's meaning. *Id*. If an ambiguity exists, it is construed in favor of the insured. *Henderson*, 460 Mich at 354.

In this case, plaintiffs argued that the terms "named insured" and "rated driver" in Esurance's policy were inaccurate and that Esurance had chosen to designate Herington as the named insured when Herington indicated that Rees was to be the policy's primary driver. The trial court considered extrinsic evidence and determined that the meaning of the term "additional driver" was ambiguous in the present policy.[2] It then determined that the terms "named insured" and "additional driver" were synonymous. We agree.

Review of Esurance's policy shows that some of its definitions applied throughout, and would appear in boldface and italics within quotation marks. The word "you" referred to "[t]he named insured(s) shown on the Declarations page," as well as the spouse of the named insured if they lived at the same residence.[3] The policy, however, did not define "named insured," "rated

---

[2] It is notable that, at the time of the answer and countercomplaint, even Esurance did not appear to be certain whether Rees was a named insured under the policy. Esurance asserted that it was not advised of several facts "by its insured, Joel Harrington [sic] and/or Melissa Rees[.]"

[3] Although Herington and Rees lived together at that point, they were not yet married.

operator," or "additional driver." The policy did not use the terms "rated operator" or "additional driver" in any location other than the declarations page. And when the policy used the term "named insured," it did not place that term in quotation marks with boldface and italics. The policy's declarations page provided that both Herington and Rees were "Rated Operators," and listed under "Driver Type" that Herington was "Named Insured" and Rees was "Additional driver."

The trial court's decision to define "named insured" and "additional driver" as synonymous was not erroneous because there was a latent ambiguity in the contract. First, the contract contemplates that more than one person may be a named insured by stating that "you" or "your" refers to "[t]he named *insured(s)* shown on the Declarations page[.]" Second, according to the testimony of the Esurance agent who originally facilitated the policy for Rees and Herington, a licensed insurance agent who was employed by and exclusively sold insurance policies for Esurance,[4] the terms "Rated Operator" and "Additional driver" are synonymous with "named insured" under the policy. The agent testified that she listed Herington as the "named insured" on the policy because he had initiated the call, Esurance's system only allowed her to designate one person as "named insured" on the declarations page, and the insurance coverage she intended to provide to Rees and Herington was identical because it was a "joint policy." She testified that an "Additional driver" and a "named insured" would be covered equally under whatever terms the policy provided, agreeing that the terms were essentially synonymous. In fact, the agent testified that she could not have listed both Herington and Rees as the "named insured" if Herington had asked; instead, she would have explained that they would have been covered equally. Moreover, when Herington specifically asked whether Rees was the primary driver on the policy, the agent assured him that they would both be covered. Finally, the agent also testified that Esurance would not have allowed Rees to pay the premium if she had been a third-party to the insurance contract.

However, when the contract was to be applied, it was not clear whether the additional driver that appeared on the declarations page was considered one of the insureds under the contract. Because the contract did not define the terms "named insured," "rated operator," or "additional driver," and extrinsic evidence in this case indicated that there was a latent ambiguity regarding whether "named insured(s)" also included the additional driver listed on the declarations page, the trial court did not err by holding that the term "additional driver" was synonymous with the term "named insured" under this contract in light of the evidence that Esurance considered the terms synonymous. Accordingly, Sowle was entitled to collect benefits from Esurance under MCL 500.3114(4)(a) because it insured Rees, the co-owner of the vehicle Sowle was operating.

---

[4] In *Stone* we stated that, in the context of the plaintiff's equitable estoppel argument, that "when an insurance policy is facilitated by an independent insurance agent or broker . . . the independent insurance agent or broker is considered an agent of the insured rather than an agent of the insurer." 307 Mich App at 180 (quotation marks omitted). However, the agent here is an employee of Esurance and thus she acted as its representative/agent.

## IV. RESCISSION

Esurance argues that it was entitled to rescind the policy because Herington misrepresented that Rees purchased the Saturn for him. Esurance also argues that it was not its responsibility to ask Herington about changes to his initial application because the policy required Herington to inform it of any changes. Esurance further argues that Herington committed misrepresentations by failing to tell it that: (1) Rees and Sowle co-owned the Saturn, (2) the Saturn would not be garaged at his address, and (3) the car was for the use of Sowle, who did not reside with Herington and was an unlicensed driver. We conclude that Esurance has not established that the ownership status of the vehicle was material or that Herington engaged in silent fraud when he failed to inform Esurance that the vehicle would be kept at another address and that Sowle would drive it.

Insurance policies are subject to the same construction principles as other contracts. *Titan Ins Co v Hyten*, 491 Mich 547, 554; 817 NW2d 562 (2012). Because insurance policies are contracts, a party may invoke common-law defenses, including fraud, to avoid enforcement of an insurance policy. *Id*. at 554-555. "[F]raud" includes both fraudulent misrepresentation and fraudulent concealment. *Id*. at 555.

Esurance argues that Herington made a material misrepresentation when he informed Esurance's representative that Rees purchased the Saturn "for him." However, Esurance did not establish that the vehicle's ownership was material to whether it would issue an insurance policy.

A misrepresentation is material when "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make the contract." *Oade v Jackson Nat'l Life Ins Co of Mich*, 465 Mich 244, 251; 632 NW2d 126 (2001) (quotation marks omitted). In this case, Esurance's policy did not require the applicant to identify the ownership of the vehicle, nor did its definition of "covered auto" limit itself to vehicles owned by the insured. Esurance's initial policy covered a Dodge RAM that Rees solely owned. Esurance's representatives testified that it did not matter who owned the insured vehicles and they did not ask about ownership. Esurance has not established that it would have refused to make the contract if it knew that Rees, rather than Herington, owned the vehicle.

Esurance also argues that Herington engaged in silent fraud when he failed to disclose that the Saturn would not be garaged at his address and that Sowle would be the primary driver of the Saturn. However, Herington did not suppress the truth about where the car would be located or who would be driving it. Instead, Esurance did not ask him these questions when adding the Saturn, and the policy did not require him to update Esurance about garaging locations or drivers except when renewing the policy.

We recognize the doctrine of silent fraud. *Titan*, 491 Mich at 557. Silent fraud is "[a] fraud arising from the suppression of the truth[.]" *Id*. (quotation marks and citations omitted). A person who "remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment." *US Fidelity & Guaranty Co v Black*, 412 Mich 99, 127; 313 NW2d 77 (1981) (quotation marks and citation omitted).

Here, the policy provided that Esurance relied on the truth and accuracy of the statements made in the application and at the time of each renewal. The application provided for a "mailing

address" and a "garaging zip." The application indicated that "all vehicles shown on this application are garaged at the same location in the Garaging Zip code shown above." The policy required the applicant to "declare that you have listed all drivers in your household, including any regular or frequent operators of the vehicle(s) described in the Application[.]" The word "including" is defined as "to take in or comprise as part of a whole or group" or "to contain between or within." *Merriam-Webster's Collegiate Dictionary* (11th ed). Accordingly, the plain language of the application required the applicant to list all the drivers in the household, and, as part of that list, the regular and frequent operators of the vehicles. At the time of the application, Sowle was not part of the household and was not a regular or frequent driver of the Dodge RAM, which was the only vehicle listed on the application.

The application did require the applicant to inform Esurance of any changes to the applicant's "email address, mailing address, or telephone number . . . ." However, it did not refer to changes regarding where the vehicles were garaged.[5] In the general provision headed "CHANGES," the policy indicated that changes to the number of vehicles, operators using the vehicles, place of principal garaging, and coverage limits might result in a premium change, but it did not require the insured to update Esurance regarding that information.

When Rees attempted to add the Saturn to the policy, Esurance's customer service representative did not ask Rees who would be driving the car. To add a vehicle to an existing policy, the customer service representative was required to ask for a VIN number, whether the vehicle is owned, financed, or leased, whether it is used for business, whether it has safety features, and what amount of coverage the customer wants. In Michigan, Esurance customer service representatives are not required to ask who was operating a vehicle that would be added to a policy or ask who was driving which vehicle. A second customer service representative also did not ask Herington these questions during a subsequent phone call. The second representative testified that Esurance's system walked her through how to do tasks step-by-step, and she was not required to ask if someone wanted to add a driver when they were adding a vehicle.

The amended declarations page included a Saturn LW1. It included a mailing address for Herington, did not indicate a garaging zip, and incorporated by reference the "Personal Auto Policy." Nothing in the policy required Herington to update Esurance about the garaging zip and drivers at times other than at the time of application and renewal.

Accordingly, Herington did not remain silent regarding the Saturn's garaging location or driver when he was required to speak about it. Since the policy did not require Herington to update Esurance regarding the vehicles' garaging locations, and Esurance's representatives did not ask him where the Saturn was to be garaged, Herington had no reason to know that that information was important to Esurance or that Esurance would rely on it when issuing an amended policy including the Saturn. The trial court did not err when it held that Herington had not made a material misrepresentation to Esurance about where the Saturn would be garaged when he failed to tell Esurance that it would be primarily located at the house of Sowle's friend.

---

[5] It is unclear from the record whether the house where Sowle kept the vehicle was in a different zip code than Herington's house.

While Esurance argues that it would not have insured the Saturn had it known that Sowle was in a different household and was to be the primary driver of the Saturn, the policy did not state that Herington was required to update Esurance about the vehicles' drivers. Herington was also not asked whether Sowle would be a frequent driver. Herington did not fail to include Sowle in a list of drivers in his household at the time of the application. Additionally, Herington could not have known that the customer service representative assumed that he would drive the vehicle.

The trial court also did not err when it concluded that Esurance failed to demonstrate a genuine issue of material fact regarding whether Herington engaged in silent fraud when he failed to inform Esurance that Sowle was the Saturn's primary driver. Because we conclude that the trial court did not err by concluding that Rees and Herington did not engage in misrepresentation or silent fraud, we need not address plaintiffs' arguments that Esurance attempted to rescind the policy to the wrong date or that, even if rescinded, Sowle was still entitled to coverage under Esurance's innocent-third-party contractual provision.

## V.  INTENTIONAL INJURY

Esurance argues that the trial court erred by ruling that there was no genuine issue of material fact regarding whether Sowle intended to injure herself. We disagree because Esurance had the burden to show a genuine issue of material fact regarding whether her injury was intentional; and, when the evidence is viewed in the light most favorable to Esurance, there are still equally probable, different explanations for Sowle's accident. Moreover, because the circumstances lead to mere speculation, they do not constitute circumstantial evidence of an intent to commit suicide.

We review de novo a lower court's decision on a motion for summary disposition. *Dye*, 504 Mich at 179. The trial court may only consider admissible evidence when deciding the motion, though the evidence need not be in an admissible form. *Latits v Phillips*, 298 Mich App 109, 113; 826 NW2d 190 (2012). We review for an abuse of discretion preserved challenges to the trial court's evidentiary rulings. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. We review de novo the preliminary questions of law surrounding the admission of evidence. *Dep't of Transp v Frankenlust Lutheran Congregation*, 269 Mich App 570, 575; 711 NW2d 453 (2006).

An insurer is liable to pay PIP benefits for "accidental bodily injury" arising out of the use of the motor vehicle as a motor vehicle. MCL 500.3105(a). Bodily injury is accidental unless suffered intentionally by the injured person or intentionally caused by the claimant. MCL 500.3105(4). The no-fault act does not abolish tort liability for harm that a person intentionally causes to persons or property. MCL 500.3135(3)(a). The insurer bears the burden to establish an exclusion from coverage. *Hunt v Drielick*, 496 Mich 366, 373; 852 NW2d 562 (2014).

Conduct is intentional if the person subjectively "intended both the act *and* the injury." *Miller v Farm Bureau Mut Ins Co*, 218 Mich App 221, 226; 553 NW2d 371 (1996). Reckless conduct is not sufficient to show an intentional injury. *American Alternative Ins Co, Inc v York*, 470 Mich 28, 32; 679 NW2d 306 (2004). Circumstantial evidence may be used to determine

"questions concerning the state of one's mind, including intent[.]" *Bergen v Baker*, 264 Mich App 376, 387; 691 NW2d 770 (2004).

Relevant evidence is evidence that tends to make the existence of a fact of consequence more or less likely to be true. MRE 401. MRE 404(a) provides that evidence of a person's character is not admissible "for the purpose of proving action in conformity therewith on a particular occasion," with some exceptions. One exception is that evidence of "other crimes, wrongs, or acts" is admissible if offered for a proper purpose, logically relevant, and not unfairly prejudicial under MRE 403. *Rock v Crocker*, 499 Mich 247, 257; 884 NW2d 227 (2016). "[I]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible." *Id.* (quotation marks and citation omitted). Evidence is offered for a proper purpose if it is probative of the actor's intent, among other things. *Id.* at 256-257.

First, the evidence did not establish that Sowle attempted to commit suicide frequently or recently. Other-acts evidence may be admissible if a type of act occurs with unusual frequency, on the basis that it is objectively improbable that such events occur so often in relation to the same person because of mere happenstance. *People v Mardlin*, 487 Mich 609, 617; 790 NW2d 607 (2010). While in this case Sowle attempted to commit suicide as a teenager when she overdosed on a prescription medication, this was a single incident. To the extent that Esurance argues that a second incident, during which Sowle became ill after taking ibuprofen and drinking alcohol, was a suicide attempt, there is no genuine issue of material fact regarding whether that incident was a suicide attempt. Sowle and Rees testified that that incident was accidental, and multiple witnesses testified that a psychiatric report determined that the incident was not intentional. Accordingly, Esurance has not demonstrated that evidence of Sowle's prior attempt to commit suicide was probative on the basis that she attempted suicide with unusual frequency.

Other-acts evidence may be admissible if the acts contain common features that indicate the existence of a plan rather than a series of similar acts. *People v Sabin (After Remand)*, 463 Mich 43, 55; 614 NW2d 888 (2000). Again, Sowle attempted suicide when she was 17 years old by overdosing on medication. The trial court ruled that whether Sowle had allegedly attempted to commit suicide by another means would not be admissible evidence because it was not relevant to whether Sowle "intended to commit suicide at the time of the crash." The trial court's decision fell within the range of reasonable and principled outcomes because Sowle's suicide attempt as a teenager had no common features with the crash here.

Considering the admissible evidence, the trial court did not err when it ruled that Esurance's theory was speculation rather than supported circumstantial evidence of a suicide attempt. Circumstantial evidence is evidence that would "facilitate reasonable inferences of causation, not mere speculation." *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). To be circumstantial evidence of a cause, the facts or conditions require "a reasonable likelihood of probability rather than a possibility," and "such evidence must exclude other reasonable hypotheses with a fair amount of certainty." *Id.* at 166 (quotation marks omitted).

In this case, while Sowle testified that she had no memory of the late-night accident, she also testified that, in the days before the accident, she did not intend to kill herself. When Sowle left the motel, she texted her aunt that she was going to arrive shortly to pick up gas money. While

-9-

heavily medicated after the accident, Sowle told a police officer that she had been at the motel, felt unsafe, and wanted to go somewhere safe. She did not indicate that she was trying to commit suicide. A police trooper testified that she had interviewed multiple people who knew Sowle and there were no indications that Sowle had attempted to kill herself.

Wolff testified that shortly before the accident, he and Sowle were arguing and she repeatedly refused to let him leave. Wolff thought the police were on their way because of the nature of the argument. He accelerated very quickly to the corner, which was less than a mile away, and put on his brakes to turn left. Wolff saw Sowle driving by him on the right, where there was only a bike lane, gravel, and grass, at high speed. While Wolff initially told the police trooper who investigated the incident that he thought it was a suicide attempt, after thinking about the situation further, Wolff believed that Sowle was an inexperienced driver and might have "freaked out and put her foot on the gas instead of the brake."

Law enforcement officers testified that Sowle's vehicle was in a yaw before it left the road. A trooper testified that Sowle's vehicle was turning "slightly" as it left the roadway. None of the officers could determine why Sowle left the road. The crash investigator testified that once the vehicle entered a yaw it was under the forces of physics. While the investigator could not tell whether the vehicle braked before it left the roadway, the crash report indicated that the driver did not apply the brake. The vehicle's engine RPM indicated that the gas pedal was to the floor at five, four, and three seconds before the crash, was released two seconds before the crash, and was reapplied one second before the crash. The vehicle was skidding at the time it impacted the tree, which was about 20 yards from the road, and struck the tree sideways.

The crash data recorder indicated that the driver's seat belt was unbuckled. Sowle speculated that she was not wearing a seat belt because she was angry, did not always wear her seat belt a short distance from home, and probably had not thought to put it on. The police trooper testified that witnesses reported that Wolff and Sowle left the motel within 15 seconds of each other. Three police officers testified that they did not know whether Sowle was attempting to harm herself. While one officer routinely determined the cause of accidents, he was not able to determine the cause of Sowle's crash. Rees testified that she placed Sowle on suicide watch at the hospital to ensure someone would be there because Rees was uncertain about how Sowle would react to the realization that she had lost her leg.

On the basis of the facts and circumstances, there are other reasonable hypotheses for Sowle's accident that Esurance's theory does not exclude with a fair amount of certainty. Sowle left the motel shortly after Wolff, traveled past him at a high rate of speed on the right after Wolff braked to turn left, entered a yaw before she left the roadway, and skidded for 20 yards before she hit a tree sideways. Other reasonable explanations for the evidence in this case include that Sowle, who had repeatedly been following Wolff throughout the evening in attempts to prevent him from leaving, may have recklessly chased after him. Or that Sowle, who had been involved in a verbal domestic dispute at the motel, was afraid and felt the need to leave rapidly. In either case, Sowle, who was an unlicensed, inexperienced driver, began to leave the road in a yaw. Sowle testified that she did not know what to do when going off the road at a high speed and may have accidentally

slammed her foot on the gas pedal rather than the brake.[6]  When the evidence is viewed in a light most favorable to Esurance, Esurance's hypothesis that Sowle was attempting to injure herself does not exclude other reasonable hypotheses—particularly that Sowle was an inexperienced driver who was driving recklessly and lost control of her vehicle—with a fair amount of certainty. Therefore, the trial court did not err when it determined that Esurance had presented speculation rather than circumstantial evidence to support that Sowle attempted suicide during this incident.

## VI.  ATTORNEY FEES AND PENALTY INTEREST

Esurance argues that the trial court's finding that its decision to withhold benefits was unreasonable was clearly erroneous.  We disagree.

"[T]he trial court's decision about whether an insurer acted reasonably presents a mixed question of law and fact." *Moore v Secura Ins*, 482 Mich 507, 520; 759 NW2d 833 (2008) (quotation marks omitted).  "What constitutes reasonableness is a question of law, but whether the defendant's denial of benefits is reasonable under the particular facts of the case is a question of fact." *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).  We review the trial court's decisions regarding questions of law de novo, and review for clear error the trial court's decisions regarding questions of fact.  *Id.*  The trial court clearly errs when we are "left with a definite and firm conviction that a mistake has been made."  *Id*. (quotation marks omitted).

MCL 500.3142(2) provides that PIP benefits are "overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained."  An insured is entitled to 12% interest on overdue payments.  MCL 500.3142(4).  Additionally, MCL 500.3148(1) establishes that a party is entitled to attorney fees if the benefits are overdue and "the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment."  "A judgment that an insurer owes PIP benefits that have not already been paid to the insured creates a rebuttable presumption that the refusal or delay in paying benefits was unreasonable." *Nashal v Fremont Ins Co*, 324 Mich App 696, 721; 922 NW2d 662 (2018). An insurer's refusal to pay is not unreasonable if "the refusal or delay in payment is the product of a legitimate question of statutory construction, constitutional law, or factual uncertainty." *Ross*, 481 Mich at 11.  The burden is on the insurer to establish that its decision was not unreasonable. *Id*.  The determinative question is whether the initial refusal to pay was unreasonable, not whether the insurer was ultimately liable for benefits.  *Id.*

Esurance initially refused to pay plaintiffs' claims on March 29, 2017, for the accident that occurred on March 16, 2016.  As an initial matter, to the extent that plaintiffs contend that statutory construction was not the original basis of Esurance's denial, this procedural fact is not determinative.  An insurer is not generally estopped from asserting a different defense to an insurance claim because estoppel is not available to broaden the coverage of an insurance policy.

---

[6] This explanation is consistent with cases of nonmechanical sudden acceleration, in which complaints of sudden acceleration were found to be "caused by the operators' mistaken pedal applications.  That is, drivers accidentally pressed the gas pedal rather than the brake." *Jones v Ford Motor Co*, 204 Fed Appx 280, 283 (CA 4, 2006), citing Nat'l Highway Traffic Safety Admin, *An Examination of Sudden Acceleration 1* (1989).

*Gividen v Bristol West Ins Co*, 305 Mich App 639, 646-647; 854 NW2d 200 (2014). In any event, we conclude that the trial court did not abuse its discretion when it found that Esurance's denial was unreasonable when Esurance relied on clearly distinguishable caselaw to justify its refusal to pay. Specifically, Esurance cited caselaw regarding claims where no owner of the vehicle maintained insurance, which was never the case here.

Esurance next argues the trial court clearly erred when it ruled that Esurance's initial refusal to pay no-fault benefits was not based on a legitimate factual uncertainty as to whether its rescission of coverage was justified due to Herington's material misrepresentations or omissions when adding the Saturn to his policy. As already discussed, the recorded calls demonstrate that Esurance's agent clearly understood Herington was not the owner of the Saturn and that no Esurance agent asked who would be driving that vehicle. This information was consistent with Esurance's examinations under oath, at which Rees testified that she was an owner of the Saturn and added the Saturn to her policy. When Esurance denied Sowle's request for benefits, Esurance had all of the information that it needed to know that Herington had not misrepresented that he was the owner of the Saturn at the time it denied benefits. Accordingly, the trial court did not clearly err.

Likewise, Esurance's initial refusal to pay no-fault benefits was not based on a legitimate factual uncertainty as to whether Sowle acted intentionally to injure herself or commit suicide. The trial court found that Esurance's refusal to pay was unreasonable on the basis that Esurance had the police report, the Saturn's black box, Sowle's examination under oath, and her medical records at the time it made its denial. The record reflects that the police generated a lengthy report and investigated whether Sowle had intentionally attempted to strike her boyfriend's vehicle or run off the road. For the additional reasons we have already discussed, the trial court concluded that the circumstances surrounding this accident demonstrated that Esurance speculated that Sowle acted with the subjective intent to harm herself. Therefore, the trial court determined that Esurance had not met its burden of rebutting the presumption that its denial of benefits was unreasonable. We cannot conclude that the trial court was clearly mistaken in its factual findings or that it abused its discretion.

Affirmed.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Anica Letica